## CHUMASERO *v.* POTTS.

MANDAMUS ISSUED BY COMMON-LAW COURTS. The power to issue the writ of mandate is a branch of the common law, and any court, on which common-law jurisdiction has been conferred, is authorized to issue the writ.

JURISDICTION OF COURTS REGULATED BY LEGISLATURE. The ninth section of the Organic Act, approved May 26, 1864, confers upon the legislative assembly the power to define the jurisdiction of the courts of the Territory, subject to the limitations specified therein.

JURISDICTION IN MANDAMUS. The grant of common-law jurisdiction, by said Organic Act, upon the supreme court carries with it jurisdiction in mandamus, which cannot be taken away by the legislative assembly.

JURISDICTION OF COURTS. Said Organic Act confers upon the district and supreme courts appellate and original jurisdiction.

JURY IN COMMON-LAW COURTS. Courts which have common-law jurisdiction can impanel a jury and receive a verdict, in the absence of a statute providing for the same.

PETITIONERS FOR MANDAMUS. Any citizen of the Territory may be the relator in an application for a writ of mandate, when the subject-matter relates to the validity of an election.

DUTY OF TERRITORIAL CANVASSERS. Under the laws of the Territory, the governor, secretary and marshal of Montana must act together in canvassing the votes upon "An act to change the seat of government of the Territory of Montana," "known as the Capital Law," approved February 11, 1874.

No DEMAND FOR PERFORMANCE OF PUBLIC DUTY. The writ of mandate can be issued against Federal officers, that have failed to perform a duty of a public nature, imposed upon them by the legislative assembly, when no demand for the performance thereof has been made.

MANDAMUS ISSUED TO THE GOVERNOR. This court can compel the governor of the Territory, by its writ of mandate, to perform the ministerial act of canvassing the vote upon said Capital Law.

DUTIES OF FEDERAL OFFICERS. The legislative assembly can require the Federal officers of the Territory to perform duties, which are not enumerated in said Organic Act.

PLEADING ABOUT LEGAL REMEDY. The application for a writ of mandate need not allege that the petitioner has no plain, speedy and adequate remedy at law.

JURISDICTION OF MANDAMUS. The legislative assembly of the Territory has conferred rightfully upon the supreme court, original jurisdiction to issue the writ of mandate.

ELECTOR WHO IS "BENEFICIALLY INTERESTED." An elector of the Territory is "beneficially interested" in legal proceedings to compel its officers to perform their duties, and is the proper party to apply for the writ of mandate to secure this result.

REMEDY OF MANDAMUS. Mandamus affords the only remedy to the citizen who seeks to compel an officer to perform his duty to the public.

CERTIFICATE OF CANVASSERS. The certificate of the Territorial canvassing board, upon the vote for the approval of the Capital Law, is *prima facie* evidence of the legal vote cast at the general election; and the members of the board have no right to go behind the abstracts of the votes returned to it.

JURY TRIAL IN MANDAMUS. Under the Civil Practice Act, a party to the proceedings in mandamus does not have the absolute right to a trial of the facts by a jury, and courts can exercise their discretion respecting the mode of trial.

NATURE OF MANDAMUS PROCEEDINGS. A proceeding in mandamus is not a case at common law, or a civil action under the Civil Practice Act.

ACT OF CONGRESS RELATING TO TRIAL BY JURY CONSTRUED — *mandamus proceedings.* The act of congress, entitled "An act concerning the practice in Territorial courts, and appeals therefrom," approved April 7, 1874 (18 U. S. Sts. 27), contains this clause: "*Provided,* that no party has been or shall be deprived of the right of trial by jury in cases cognizable at common law." *Held.* that the term, " cases cognizable at common law," does not include proceedings in mandamus.

CASE DOUBTED. The case of *People* v. *Pacheco,* 29 Cal. 210, holding that a proceeding in mandamus must be prosecuted in the name of the real party in interest, and that it could not be prosecuted in the name of the State, doubted.

GRANTING A TRIAL BY JURY. The discretion of courts in awarding or refusing a jury in proceedings in mandamus will be governed by the manner in which material issues have been presented; the condition of the public

mind in the district in which the court is held; the interests at stake; the difficulty in procuring jurors from a disinterested section; and the delay resulting from the trial of the issues in another court.

FOUR applications for the writ of mandate were heard and determined at this term, which related to the seat of government of Montana, and contained substantially the same allegations. The pleadings in the first proceeding, that of *Chumasero et al.* v. *Potts et al.*, are stated in the opinion of WADE, C. J. The other applications were filed in open court, and comprised those of *Lawrence* v. *Hickman, Sanders* v. *Star* and *Shober* v. *Callaway.* Hickman, the Territorial treasurer; Star, the Territorial auditor; and Callaway, the secretary and acting governor of the Territory, had their offices in Virginia city. The relators alleged that Helena was the capital of the Territory, and the chief object of these proceedings was to compel these officials to remove their offices, books and archives from Virginia city to Helena. Star answered and the other parties filed demurrers, and legal questions of a similar character were discussed by counsel in the proceedings. The demurrers were overruled, and answers were filed and the parties applied for a jury to try the issues of fact. This application was denied for the reasons which appear in the opinion of KNOWLES, J., *post*, 258.

An appeal was taken to the supreme court of the United States and dismissed in February, 1876, for want of jurisdiction. 92 S. C. 358.

W. F. SANDERS, CHUMASERO & CHADWICK and JOHNSTON & TOOLE, for relators.

S. WORD, J. G. SPRATT, H. F. WILLIAMS and C. W. TURNER, for Callaway and Hickman; H. N. BLAKE, for Potts and Star

No briefs on file.

WADE, C. J. This is an application by William Chumasero and John A. Johnston for a peremptory writ of mandate, to issue from this court against B. F. Potts, governor, J. E. Callaway, secretary, and W. F. Wheeler, marshal, of Montana Territory, to compel the performance by them of certain acts.

The petition sets forth, among other things, that the petitioners are electors of said Territory; that they reside at the town of Helena, in the county of Lewis and Clarke, and are there engaged in the practice of law; that in the course of such practice it is necessary for them to make frequent journeys to the capital of said Territory, in attendance upon the supreme court thereof, in which court they practice as attorneys and counselors at law, and which court is required to be held at the seat of government of said Territory twice in each year; that such journeys to the capital of said Territory, situate at Virginia city, are attended with great expense and inconvenience, and that as such electors and attorneys and counselors at law, they are beneficially interested in the removal of the seat of government of said Territory from the city of Virginia, in Madison county, to the town of Helena, in the county of Lewis and Clarke.

The petitioners further state, that by virtue of an act of the legislative assembly, passed upon the 11th day of February, 1874, the seat of government of said Territory was removed from Virginia city to the town of Helena, but subject to the approval thereof of a majority of the legal votes cast on that question at the first general election after the passage of such act; that upon the first Monday of August, 1874, in pursuance of said act, and the act of congress of May 26, 1864, the question of so removing the seat of government was regularly and legally submitted to the qualified electors of said Territory in the several counties thereof, and that said electors upon that day, throughout the Territory, voted upon the question of the approval or disapproval of said act of the legislative assembly according to the terms and provisions of such act.

The petitioners then state the vote of each county in the Territory upon the approval or disapproval of said act, as ascertained and counted by the county commissioners in each of said counties, in pursuance of the statutes in such case made and provided, the vote of Meagher county being by such count 561 votes for the approval of the act, and 29 votes for the disapproval thereof, and that the aggregate of such vote was for the approval of said act, 4278, and for the disapproval thereof, 3821 votes; that, by virtue of said vote and such election, the seat of government was re-

moved from said Virginia city to the town of Helena; that the votes so cast in each of said counties were duly returned to the offices of the county clerk of the board of county commissioners for each of said counties, and that such votes were regularly opened, and an abstract thereof made, which abstracts yet remain in the offices of said county clerks; that, within thirty days after such election, it became the duty of the secretary and marshal, in the presence of the governor, to meet, and if a certified copy of the abstract of the votes of each of said counties had not been received, it became the duty of the secretary then and there to send a messenger for an abstract of such absent vote, and that, when all of the abstracts of the votes from the several counties had been received, it became the duty of the secretary and marshal, in the presence of the governor, to canvass and count said votes; that the secretary and marshal did on the 2d day of September, 1874, meet in the presence of the governor to canvass said vote, but that when they so met they did not have before them a certified copy of the vote of Meagher county, or the county of Gallatin, upon the approval or disapproval of such act; that the secretary failed and neglected to send for the abstract of the votes of said counties; that said canvassers made a canvass of the votes of all the other counties of said Territory except the vote of the counties of Meagher and Gallatin; that said canvassers had before them at said canvass, a paper which was not a certified copy of the abstract of the vote of Meagher county, and which did not have affixed thereto the seal of said county, or the signature of the clerk of the board of county commissioners, but which was false and forged, wherein the votes of Meagher county upon the approval or disapproval of said act were falsely represented to be 561 votes for the disapproval thereof and 29 votes for the approval thereof, when in fact the true vote as given at said election, and as shown by the abstract thereof made by the county commissioners, was 561 votes in approval of said act, and 29 votes in disapproval thereof, which said false and forged paper was accepted by said canvassers as the true abstract of the vote of said Meagher county, and was counted by them in said canvass, by means of which, the approval of the said Capital Law as herein set forth was not declared by said secretary and marshal, but that the said sec-

retary did falsely and fraudulently declare as the result of said pretended canvass upon the approval or disapproval of said act, that there had been cast a majority of 152 votes for the disapproval of said act.

The petitioners further state, that the secretary and marshal have been requested, and it has been demanded of them that they make a canvass of all the votes cast at said election, including the votes of the counties of Meagher and Gallatin, but that they have refused and still do refuse so to do.

. The petitioners further state, that they have no adequate remedy at law, and therefore ask of this court a peremptory writ of mandate to issue against the secretary, marshal and governor, to compel a canvass of all the votes of the Territory upon the question of the approval or disapproval of said act removing the seat of government of the Territory to the town of Helena.

To this petition the governor appears by demurrer, and says, in substance :

First. That this court has no jurisdiction to issue a writ of mandamus ; in other words, that this court has no original jurisdiction.

Second. That the petitioners have not the right or capacity to bring this action or to ask for such writ.

Third. That no demand was made upon him prior to the application for the writ.

Fourth. That the court has no right or authority to in any manner control the action of the executive by mandamus.

Fifth. That the act of the legislative assembly, requiring of the governor, secretary and marshal the service of canvassing the vote of the Territory at a general election, is a requirement of said officials unknown to the Organic Act, and a violation of the provision thereof, which prohibits any Federal official from holding a Territorial office, and, therefore, that the act imposing the duty of canvassing such vote is void.

The secretary also appears by motion, and objects to the issuance of the writ for substantially the same reasons as those assigned in the demurrer of the governor.

It will be apparent to the most casual observation, that the questions raised by this demurrer and motion are of the very

highest concern, and that the fate of this case, as it may affect the city of Virginia, or that of Helena, sinks into utter insignificance, when placed beside the great principles involved. We have, therefore, given the questions presented the grave and patient consideration their importance demands at our hands.

First. As to the jurisdiction of the court. It is contended, upon behalf of the respondents, that in the early days of this court, soon after its organization, and while the records and the forms of practice and procedure were in a state of chaotic uncertainty and disorderly confusion, there were two cases decided by the justices thereof, which decisions denied to the court jurisdiction in mandamus, and that these decisions are precedents and authority which should conclusively control the action of the court in the case at bar. What was determined by these cases, or how they arose, depends very much upon the recollection and memory of the pioneers of the Montana bar, as the record of the cases, if the mutilated document produced here may be called ·a record, does not give much light upon the subject, and the recollection of the attorneys is contradictory and uncertain. The cases were tried some time in 1865, and before the decisions of the court were preserved in an authoritative form, but enough does appear from the antiquated and mutilated document, and from the recollection of those who helped to try, or were present at the trial of the cases, that an application to this court was made for a writ of mandate to obtain possession of certain offices, which application was denied, evidently for the reason that *quo warranto* was the proper remedy to accomplish such a purpose, so that, if this record was in such condition that it could be in any sense regarded as an authority in the present case, it would not be an authority either for or against the jurisdiction of this court to issue a writ of mandamus, when that remedy was applied for in a case in which the writ is applicable.

We are compelled then to determine the question of jurisdiction, as a new question, never having been decided in this Territory.

The office of the writ of mandate is to compel the performance of an act which the law specially enjoins as a duty resulting from an office, trust or station, and is issued by a court having jurisdic-

tion to any inferior tribunal, board or person. It is a writ of an exalted character, and is often denominated the prerogative writ, or the writ of right, because it is interposed to prevent disorder from a failure of justice, where the law has established no specific remedy, and where in justice and good government there ought to be one. The power to issue the writ in a proper case is a branch of the common law, and, whenever common-law jurisdiction is conferred upon a court without restriction or limitation, such court necessarily has authority to issue the writ. Considering, then, the objects and purposes of the writ, and its nature and character, we naturally look to the highest courts in the land for the right to issue and use it. But courts in this country depend for their existence and their jurisdiction upon the law that creates and clothes them with power and authority, and, in looking for the jurisdiction of the supreme court, we must go back to the fountain and source of authority, to the Organic Act, which called the Territory into being, and which is at once our charter and constitution.

Section 9 of this act provides: " That the judicial power of said Territory shall be vested in a supreme court, district courts, probate courts, and in justices of the peace. The supreme court shall consist of a chief justice and two associate justices, any two of whom shall constitute a quorum, and who shall hold a term at the seat of government of said Territory annually. *  *  The said Territory shall be divided into three judicial districts, and a district court shall be held in each of said districts by one of the justices of the supreme court, at such times and places as may be prescribed by law. *  *  The jurisdiction of the several courts herein provided for, both appellate and original, and that of probate courts and of justices of the peace, shall be as limited by law; *provided*, that justices of the peace shall not have jurisdiction of any matter in controversy when the title of land may be in dispute, or where the debt or sum claimed shall exceed $100 ; and the said supreme and district courts, respectively, *shall possess* chancery as well as *common-law jurisdiction.*  *  *  *
Writs of error, bills of exceptions, and appeals shall be allowed in all cases from the final decisions of said district courts to the su-

preme court, under such regulations as may be prescribed by law."

By this section of the Organic Act the jurisdiction of the supreme and district courts are defined; and first, this jurisdiction may be such as the legislature sees proper to confer, but this general grant of jurisdiction is limited and controlled by the other words of the section, "that said courts shall possess chancery as well as common-law jurisdiction." And, although the supreme and district courts are granted such jurisdiction as the law shall define and declare, yet the grant is so restricted that by no law or legislation can the chancery and common-law jurisdiction be taken from such courts. The words of the section in relation to jurisdiction, when read as they modify and restrict each other, are as follows: "The jurisdiction of the several courts herein provided for, both appellate and original, and that of probate courts and of justices of the peace, shall be as limited by law," but "said supreme and district courts, respectively, shall possess chancery as well as common-law jurisdiction."

It is contended, however, by virtue of this section, that the supreme court therein organized and established is exclusively a court of appellate jurisdiction, and that it has no original jurisdiction whatever.

How is this proposition maintained? Simply and solely from the fact that appeals are allowed from the district courts to the supreme court, as if the grant of appellate jurisdiction necessarily excluded the possession of original jurisdiction. This section provides that the supreme court and the district courts, respectively, shall possess chancery as well as common-law jurisdiction, and that this jurisdiction shall be as limited by law. That is to say, these courts shall exercise such chancery and common-law jurisdiction as the legislature of the Territory, by legislative enactment, shall provide they may, and no more, subject to the restriction that such courts shall always have chancery and common-law jurisdiction, and this jurisdiction cannot be taken away by the legislature. Authority is given directly and explicitly to the legislature to determine this jurisdiction, subject to the limitation that justices of the peace shall not meddle with the title to land, and shall not try cases wherein the amount in controversy exceeds $100, and that

appeals may be taken from the district courts to the supreme court, and subject to the restriction that the supreme and district courts shall always possess chancery and common-law jurisdiction. The legislature has supreme control over the jurisdiction of the several courts created by the Organic Act. Within these boundaries it may grant or withhold jurisdiction at its sovereign will and pleasure. The supreme court has appellate jurisdiction by virtue of this section, and also common-law jurisdiction, and neither can be taken away by the legislature.

Jurisdiction in mandamus is a great branch of the common law, and therefore jurisdiction in mandamus is inherent in the supreme court, and whether this jurisdiction shall be exercised as original or appellate jurisdiction must depend upon the statutes of the Territory, and this jurisdiction cannot even be taken away by the legislature. The grant of common-law jurisdiction carries with it jurisdiction in mandamus, and no power except congress can take away this jurisdiction.

How does the district court become possessed of original jurisdiction? By precisely the same means as does the supreme court, and neither of said courts can have any such jurisdiction but for the words of the Organic Act, which confers chancery and common-law jurisdiction upon both. Jurisdiction in the district court, as that of the supreme court, shall be as limited by law, subject to the restrictions of the Organic Act, and therefore it is that if jurisdiction in mandamus is denied the supreme court, it must fail in the district court, for both receive their authority from the same source, and from the same grant of jurisdiction.

The district courts may be appellate courts as well as courts of original jurisdiction. Whether they are or not depends upon the legislature. Ever since the Territory was organized, and ever since the system of Territorial government, under organic acts precisely similar to our own, was established, appeals have been going on from the probate court and justices' courts, by virtue of legislative enactments; and did any one ever doubt the validity of the statutes providing for such appeals? But these statutes were all wrong, they were all void, if the construction of the 9th section of the Organic Act contended for prevails; and why? Because it is claimed that the supreme court is exclusively an ap-

pellate court, and that the district courts are exclusively courts of original jurisdiction, and hence their exercise of appellate jurisdiction is a nullity. The words of the Organic Act do not compel any such forced construction. Their fair and natural meaning is, that both the supreme and district courts are clothed with appellate and original jurisdiction.

This construction of the Organic Act is not unsupported by authority. In the case of *Kendall* v. *United States*, 12 Pet. 524, the supreme court of the Unites States gives a construction to words similar in meaning and import to the grant of jurisdiction in our Organic Act. In the District of Columbia there was a court called the circuit court, and it was given jurisdiction by congress in the words following: "That the said court shall have cognizance of all cases, in law and equity, between parties, both or either of which shall be resident, or be found within the district," and, under this grant of jurisdiction, the court held that this circuit court had authority to issue the writ of mandamus.

But the authority of the case of *Hornbuckle* v. *Toombs* seems fully and conclusively to sustain the views herein expressed. In that case, the court say (18 Wall. 655): "Whenever congress has proceeded to organize a government for any of the Territories, it has merely instituted a general system of courts therefor, and has committed to the Territorial assembly full power, subject to a few specified, or implied conditions, of supplying all details of legislation necessary to put the system into operation, *even to the defining of the jurisdiction of the several courts.* As a general thing, subject to the general scheme of local government chalked out by the Organic Act, and such special provisions as are contained therein, the local legislature has been intrusted with the enactment of the entire system of municipal law, subject, also, however, to the right of congress to revise, alter and revoke at its discretion. The powers thus exercised by the Territorial legislatures are nearly as extensive as those exercised by any State legislature; and the jurisdiction of the Territorial courts is collectively co-extensive with and correspondent to that of the State courts, a very different jurisdiction from that exercised by the circuit and district courts of the United States. *In fine, the Ter-*

*ritorial, like the State courts, are invested with plenary munici-
pal jurisdiction."*

This is the language of the supreme court of the United States
in a decision rendered during the last year, in a case taken from
this Territory to that court, and as long as that decision remains
in force we must conclude that the Territorial legislature may
define the jurisdiction of the several Territorial courts, subject to
a few specified or implied conditions, among which, it is not un-
reasonable to say, is the condition that justices of the peace shall
not have jurisdiction in cases where the title to land comes in
question, or the amount in dispute is more than $100; that appeals
may be taken from the district courts to the supreme court; that
both supreme and district courts shall possess chancery as well as
common-law jurisdiction, and that such jurisdiction shall not be
destroyed by any act of the legislature. And, with this enuncia-
tion of the powers of our Territorial legislature, under our
Organic Act, we must hold that a statute of our legislature, con-
ferring jurisdiction upon all the courts of the Territory, except
probate and justices' courts, in mandamus, does confer jurisdic
tion, in such cases, upon the supreme court, and that such act of
the legislature is not in contravention of the Organic Act.

The supreme court of the Territory of Colorado, organized and
deriving its jurisdiction from and by virtue of an organic act, in
substance and effect precisely like our own, in an adjudicated case
hold that the supreme court of Colorado has original jurisdiction
in mandamus. This case is directly in point upon the question
now being considered, and is the only decision which any Terri-
torial supreme court has rendered involving the question of orig-
inal jurisdiction in mandamus in such courts, and, having been
rendered by a court organized and deriving its authority, like our
own, from an organic act of similar import, it must be regarded
as authority. *People* v. *Hallett*, 1 Col. 352.

It is said that our statute provides that the issue of fact in man-
damus may be tried by a jury, and that, as there is no law author-
izing this court to call a jury, therefore it can have no jurisdic-
tion. But can it possibly be claimed that a court having common-
law jurisdiction cannot call a jury in a proper case? The right
to a jury, and the mode and manner of calling it and of submit-

ting issues to it for trial, form a part and parcel of the common law, and any court having common-law jurisdiction can always impanel a jury in a proper case for a jury, and cause a verdict to be rendered. But even if this was not the case, the statute in relation to mandamus provides that an issue of fact may be sent to a jury for trial, and that for this purpose the case may be sent to any county in the Territory, and this provision looks as if the legislature supposed that this court might be called upon to exercise its jurisdiction in mandamus, and thereby provided the means for submitting an issue to a jury in a proper case.

2. It is claimed that these relators have not the right or the capacity to demand the relief sought, upon the ground that they are mere private citizens, and show no definite, specific title or interest in the relief demanded.

The statute provides that the party seeking the relief shall be beneficially interested therein; and are these relators so interested in the relief demanded as that they have the right to bring this action? This distinction is made in the authorities, and must be kept in view here, that where a party seeks a mere private right or private relief he must show a specific title or right to the relief demanded, but where the relief is a public matter, or a matter of public right, the people at large are the real party, and any one of the citizens can bring the action.

In the case of *The People* v. *Collins,* 19 Wend. 56, the court say that, in matter of public right, any citizen of the State may be relator in an application for a mandamus to enforce the execution of the common law or an act of the legislature. And this was said in a State where the law provided an attorney-general to prosecute for the people, and in their name, and was put upon the ground that the attorney-general might fail in doing his duty, and for this reason left the right with any individual citizen. The reason of this doctrine applies with much stronger force in a State or Territory, as in that of our own, where the legislature has failed to provide an officer to prosecute for the people at large, for, in our Territory, if the individual citizen had not the right, then it would be lost altogether.

Also. Moses, on Mandamus, says, page 198: "And when the subject-matter has relation to the validity of an election, it seems

that it is a matter of such public right that any citizen may be a relator in an application for a mandamus." This view of the subject is fully sustained by the following authorities: *State* v. *Marston*, 6 Kansas, 532; *State* v. *Bailey*, 7 Iowa, 390; *Crowell* v. *Lambert*, 10 Minn. 369; and the authorities cited in opposition mostly relate to mere private rights and private relief, and do not contradict the position here taken. It follows then that the relators have the right to bring this action.

3. It is contended that the petition shows that no demand was made upon the respondents before bringing this action. There is an allegation of demand upon the secretary and marshal for a canvass of the vote of the Territory, and the averment is such as would authorize proof of demand to be given in evidence, and demand having been made upon two of the canvassers, we are called upon to inquire in what capacity the secretary, marshal and governor act in making a canvass of the vote. Each one of the canvassers have specific duties to perform, and neither can act without the presence of the other. The secretary and marshal count the vote, and the governor declares the result, but no step can be taken, no count can be had, except the three canvassers be present. The act of either would be utterly void without the presence of the other. Hence we say that the secretary, marshal and governor, by the statute imposing upon them the duty of making a canvass of the vote, act as commissioners for that purpose. They are a canvassing board, and demand upon one would be a demand upon all.

But as to the necessity of demand in any case, here again a distinction is made between duties of a public nature and those of a mere private character, which affect private individuals only. In the case of a public duty, and strictly of a public nature, and not affecting individual interests, and where no one is especially empowered to demand its performance, there is no necessity for a demand and refusal. Where the duty is required to be performed by the law and is of a public nature, the law is a sufficient demand, and an omission to perform is a refusal. The following authorities support this view of the subject: High on Ex. Rem., §§ 13 and 41; Moses on Mandamus, 125; *State* v. *Bailey*, 7 Iowa, 390; *Commonwealth* v. *Commissioners*, 37

Penn. St. 237. And observing the distinction between duties of a public and private nature, the seeming conflict in the authorities is, to a great extent, harmonized.

4. That the court cannot control the action of the executive by mandamus.

Upon this subject we say, that the executive may be compelled to perform an act clearly ministerial in its nature, and neither involves any discretion nor leaves any alternative. And the following authorities control our judgments upon this question: Moses on Mandamus, 82, 83, 84, and authorities there cited; High on Ex. Rem., §§ 118, 119, and notes and authorities cited; *State* v. *Chase*, 5 Ohio St. 529; *Kendall* v. *United States*, 12 Pet. 524; *Marbury* v. *Madison*, 1 Cranch, 170. And we hold that the acts of the commissioners in canvassing the vote were purely of a ministerial character, like that of adding a column of figures or of the issuing of a commission to an officer duly elected to an office. In *Marbury* v. *Madison*, Chief Justice Marshall says: "It is not by the office of the person to whom the writ is directed, but the nature of the thing to be done, that the propriety or impropriety of issuing a *mandamus* is to be determined."

And so in the present case, the propriety of the writ is not to be determined by the fact that it is demanded against the executive, but by the nature of the act required of the executive to perform. And looking into the nature of the act, we say it is purely ministerial, and is absolutely defined by the law, and hence that the action of the executive in this regard may be controlled by mandamus.

5. That the act of the legislative assembly requiring of the governor, the secretary and the marshal, the duty of canvassing the vote of the Territory at general elections, is in contravention of the Organic Act, and therefore void; that is to say, because the legislature has imposed duties upon certain United States officials, unknown to the Organic Act, therefore, such action of the legislature is void. We must remember that in the case of *Hornbuckle* v. *Toombs*, the supreme court say, that congress has chalked out a general scheme of local government for the Territories, by their Organic Acts, and has intrusted the legislature with the entire system of municipal law,

and the legislature having such trust may impose what duties it sees proper upon any Federal official here, not inconsistent with their official duties, and such imposition of duties is not the creation of a Territorial office. Hence, when the legislature imposes duties upon the Federal judges, as it has done and can again, or upon the executive, as it did in the act in relation to the Territorial prison, or upon the secretary, as it did in relation to issuing the commission to notaries public, there was not, by the imposition of these duties, the creation of a new office, but simply the creation of an additional duty for an old officer. But if the act did create a new office for the governor, secretary and marshal, they are *de facto* officers, and cannot, in mandamus, deny that they are officers, as they have entered upon the performance of their duties, and *quo warranto* is the proper remedy to try the title to an office in such a case.

There are certain duties required of the governor, secretary and marshal by the Organic Act, the same as there are certain duties assigned to and required of the president by the constitution; but since the adoption of the constitution a thousand duties unknown to the letter of that instrument have been imposed upon the president by acts of congress, and whoever dreamed that by the enactment of these statutes, or by the imposition of these duties, new offices were created, and that the chief executive was not only president but a thousand other officers by virtue of these acts of congress? Besides this, congress has over and over again recognized the validity of this act of the legislature, requiring the governor, secretary and marshal to canvass the vote of the Territory at general elections, by admitting delegates to congress who obtain their seats by virtue of the election and canvass by said canvassing commissioners; and to pronounce against the validity of such law would shake to the foundation our whole system of laws.

It is insisted that the action should be dismissed as to the governor. But the governor is a member of a commission or board whose duty it is to canvass the vote. A proper case is made in the petition for such canvass by this canvassing commission, and if the marshal and governor are ready and willing to make the canvass, no hardship will be endured by requiring them, as

members of a commission which cannot act at all without their presence and their help, to do what they are willing to do without any requirement. But the order to canvass, if made at all, must be made to the commission or board, and we cannot conceive how we can require one member thereof to make a canvass without also making the same requirement of the board or commission jointly, which order must apply to each and all the members thereof.

It is said that the petition does not sufficiently state that the relators have no speedy and adequate remedy at law. This statement is mere matter of form, for the court must determine from what the petition states whether or not there is a plain, speedy and adequate remedy at law. Such an averment would be of no moment whatever, if the petition did not state sufficient facts, and if sufficient facts are stated the averment may be dispensed with.

The motion and demurrer are therefore overruled.

*Peremptory writ issued.*

KNOWLES, J.    I have had, and now have grave doubts as to whether or not the petition states facts sufficient to warrant the court in issuing a writ of mandamus against the governor, but have concluded to concur with the chief justice upon this point as well as the others as expressing the better view.

KNOWLES, J.    After the answer of the secretary and governor was filed to the petition of the above-named applicants, a demand was made by the attorneys for the resistants for a jury in this case. This brings to the consideration of this court the question as to whether or not the parties to a proceeding in mandamus have an absolute right of trial by jury, when an issue of fact is joined. A portion of section 523 of our Practice Act is as follows:

"If an answer is made which raises a question as to a matter of fact essential to the determination of the motion, and affecting the substantial rights of the parties, and, upon the supposed truth of the allegation on which the application for the writ is based, the court may, in its *discretion*, order the question to be tried before a jury, and postpone the argument until such trial can be had, and the verdict certified to the court."

This is a portion of the chapter on the writ of mandate, and refers exclusively to that subject. The right to trial by jury in mandamus proceedings, then, is not absolute under our statutes.

An act of congress, entitled "An act concerning the practice in Territorial courts, and appeals therefrom," approved April 7, 1874, contains this clause: "*Provided*, that no party has been or shall be deprived of the right of trial by jury, in cases cogniz- -able at common law." This is a proviso in a section of said act, which provides that the several codes of procedure in the Terri- tories shall be valid.

The question here presented for consideration is, whether or not the proceedings in mandamus is a case at common law.

If the term "common law," as used in our national constitution in the seventh amendment thereto, had not, in the case of *Par- sons* v. *Bedford*, 3 Pet. 433, received an interpretation by which we are bound, we might be called upon to examine this term fully. The term "common law" in that case, the United States supreme court held, was a term used in contra-distinction to chancery or equity, and signified a case at law merely. It is prob- able that court would follow that rule in interpreting the statute under discussion, although the same reasons that induced that court in that case to find that the framers of the seventh amend- ment to the national constitution, when they used the term "com- mon law" meant simply law, do not so fully appear in the inter- preting of this clause. The ruling in that case was based upon the fact that when that amendment was framed all actions in the several States were at common law or in equity, and that its framers had direct reference to that condition of affairs.

Many of the States have abolished the distinction between law and equity as to proceedings. In this Territory such is the case. In fact, the distinction never existed with us. In the case of *Hornbuckle* v. *Toombs*, 18 Wall. 648, the United States supreme court held that our legislative authority had full control over the mode of procedure in our courts. This proviso, then, could not have been framed with reference to the same state of facts that existed at the time of the establishment of the seventh amend- ment to the constitution.

The term "cases in law," as used in article 3, section 2, of the

United States constitution, has been defined to be a suit or action at law. *Osborn* v. *U. S. Bank,* 9 Wheat. 738; Story on Const., § 1646. The term "case at common law," as used in this statute under consideration, was not intended to be used in any broader sense, I am confident. It certainly could not have been the intention of congress to use it in so broad a sense as to include every judicial proceeding at law, whether the same should fall under the head of a civil action, or should be denominated a special or extraordinary proceeding. The term "case at common law" I shall consider as implying only an action or suit at law. When we refer to the decisions of the supreme court of the United States to determine whether or not a mandamus is a suit or an action at law, we find ourselves involved in considerable perplexity. In the case of *Kendall* v. *United States,* 12 Pet. 524, Mr. Justice THOMPSON, in delivering the opinion of the court, says : " That the proceeding on a *mandamus* is a case within the meaning of the act of congress has been too often recognized in this court to require any particular notice. It is an action or suit brought in a court of justice, asserting a right, and is prosecuted according to the forms of judicial proceedings." The statute referred to in this, was one that gave the circuit court of the District of Columbia jurisdiction of all cases at law and in equity.

TANEY, Chief Justice, BARBOUR, Justice, and CATRON, Justice, dissented from a majority of the court in this case. Chief Justice TANEY, in his dissenting opinion, says : " Since the statute of the 9th of Anne, authorizing pleadings in proceedings by *mandamus,* it has been held that such a proceeding is in the nature of an action, and that a writ of error will lie upon the judgment of the court awarding a peremptory *mandamus.* But it never has been said, in any book of authority, that this prerogative process is 'an action,' or 'a suit,' or 'a case' at law." I have been unable to find any authority contrary to this assertion of this distinguished judge up to this decision above referred to.

Justice CATRON, in his dissenting opinion, says : "In no just sense can this writ of *mandamus* be deemed a case at law between the United States and the postmaster-general. It differs, in no material feature, from a writ of attachment issued by a court against one of its officers, where he refuses to perform an

official duty." The case of *Kendall* v. *Stokes*, 3 How. (U. S.) 100, decided by the same court, maintains the same view of proceedings in *mandamus* as in the above case.

In the case of *The Commonwealth* v. *Dennison*, 24 How. (U. S.) 97, Chief Justice TANEY, in the opinion of the court, says : " It is equally well settled, that a mandamus in modern practice is nothing more than an action at law between the parties, and is not now regarded as a prerogative writ." In support of this he cites the above-named cases of *Kendall* v. *United States*, and *Kendall* v. *Stokes*.

In the case of *Riggs* v. *Johnson County*, 6 Wall. 166, the same court, however, holds this language : " Tested by all these considerations our conclusion is, that the propositions of the defendants cannot be sustained, and that the circuit courts in the several States may issue the writ of mandamus in a proper case, where it is necessary to the exercise of their respective jurisdictions, agreeably to the principles and usages of law. Where such an exigency arises they may issue it, but when so employed, it is neither a prerogative writ nor a new suit, in the jurisdictional sense. On the contrary, it is a proceeding ancillary to the judgment which gives the jurisdiction, and when issued becomes a substitute for the ordinary process of execution to enforce the payment of the same, as provided in the contract." How can such decisions be reconciled ? The only manner in which they may be reconciled is, that the courts of the United States treat the writ of mandamus, as to the mode of proceeding thereon, and as to the nature of the *writ itself*, the same as it is treated by the laws and decisions of the State where the same is applied for. This last decision is based upon this view. See the opinion of the court in that case, 6 Wall. 189–194.

The cases of *Kendall* v. *United States* and *Kendall* v. *Stokes* arose under the laws of the District of Columbia, in the part ceded by Maryland. At that date they were the same as the laws of Maryland at the date of cession to the general government. The statute of 9th Anne, ch. 20, had, at this date, been either recognized by the decisions of the courts or adopted by statute in most of the States of the Union. High. on Ex. Rem., § 448, p. 319 ; § 496, p. 357. From what can be inferred from the

decisions in the cases of *Kendall* v. *United States* and *Kendall* v. *Stokes*, and from what authorities I possess, although not explicit upon the point, I have no doubt but that the statute of 9th Anne, ch. 20, was in force in Maryland at that date.

By that statute the party applying for or prosecuting a writ of mandamus might plead to or traverse the facts contained in the return to the alternative writ, to which traverse the person making such return might reply, take issue or demur. And the statute goes on to provide: "And such further proceedings, and in such manner shall be had therein, for the determination thereof, as might have been had if the person or persons suing such writ had brought his or their action on the case for a false return. And if any issue shall be joined in such proceedings the person or persons suing such writ shall and may try the same in such place as an issue joined in such action on the case should or might have been tried." 9 Anne, ch. 20, § 2.

This statute evidently incorporates an action on the case upon what was before the proceedings for a writ of mandamus.

The common-law authorities after this say that the proceedings in mandamus were assimilated to or were in the nature of an action. 3 Black. Com. 264; Bac. Abr., title Mandamus.

The proceedings after the return to the alternative writ have certainly all the indicia of an action at law. The decisions of the United States supreme court, in the cases of *Kendall* v. *Stokes*, *Kendall* v. *United States* and *Commonwealth* v. *Dennison*, should all, in my judgment, be considered with reference to the statute of 9th Anne. This last case was instituted on an application made directly to the United States supreme court. "The practice in the United States courts, in cases of mandamus, prior to the act of congress of June 1, 1872, was substantially identical with the practice at common law." High's Extraordinary Legal Remedies, 373, § 528.

In his opinion, in the last of the above-named cases, in support of his ruling that in modern practice the proceedings in mandamus were nothing more than "an action at law between the parties," TANEY, C. J., as before said, cites the above cases of *Kendall* v. *United States* and *Kendall* v. *Stokes*. The inference I draw from this is that the court in this case of *Kentucky* v. *Dennison*,

adopted the practice that prevailed in the District of Columbia in proceedings in mandamus, and hence adopted the common-law proceedings in such cases as modified by the statute of 9th Anne.

Courts, in referring to this statute of 9th Anne, treat it generally as a part of the common law. I cannot bring myself to the conclusion that so distinguished and able a tribunal as the supreme court of the United States could have held that the proceedings in mandamus, without being modified as by the 9th of Anne, were nothing more than an action at law between the parties. Before that statute the proceedings were altogether summary. The relator made an application, supported by a suggestion, under oath to the king's bench, setting forth facts which showed that some one of the king's officers was not performing his duty, or that some person had unlawfully intruded himself into an office, and if the court deemed the facts sufficient, an alternative writ was issued in the king's name. Neither the application or the suggestion were entitled. If the respondent made a return traversing the alternative writ fully, there was an end of the proceeding. The truth or falsity of the return could not be tried and determined in that proceeding. The applicant had a right to proceed against the respondent in an action on the case in a separate proceeding for a false return, if he had suffered any damage on account of such return. If the respondent did not fully traverse the alternative writ the peremptory writ issued. Tapping's Mandamus, 5 ; High's Extraordinary Legal Rem. 325, § 457 ; 3 Blackstone's Com. 110–111. It is true that there appears to have been a practice, at common law, at times of issuing a rule *nisi* to the respondent, on the filing of the suggestion requiring him to show cause, if any, why the alternative writ should not issue. This rule did not issue in all cases, however. Tapping's Mandamus, 5–6 ; 3 Blackstone's Com. 111. But even when the rule *nisi* was issued there could not be said to be a case at law, for neither the application, or affidavit or suggestion were entitled. And they were not entitled for the very reason that there was said to be no case as yet. High's Extraordinary Leg. Rem., § 509 ; Moses on Mandamus, 251, and cases cited there. After an alternative writ was issued, commanding the respondent to do the acts specified, or show cause, how could mandamus be called a

case or action at law between the parties. For, as we have seen, if the return fully traversed the writ, its truth or falsity could not be tried in that proceeding.

The writ was issued in the name of the king. If the return was not sufficient in law there could be no demurrer interposed to it. There seems to have been invented, for the determination of the legal sufficiency of the return, what was termed a *concilium*, if the defect was not apparent on its face. But if it was, then its legal sufficiency was determined by motion. Again, all the common-law writers upon the subject of mandamus, in speaking of the effect of the statute of 9th Anne upon the proceedings in mandamus, say after this statute mandamus became assimilated to, or assumed the nature of an action. Tapping's Mandamus (marginal page), 7; High's Extra. Leg. Rem., § 458; 3 Blackstone's Com. 265; Bac. Abr., title Mandamus. From this it is evident that these writers did not consider the proceedings in mandamus an action at law before this statute. Although we have adopted the common law of England, so far as applicable, yet the statute of 9th Anne, upon this subject, is not in force with us. We have adopted a statute at variance with and which takes the place of and supersedes it.

If I am correct in the foregoing views the decisions in the cases of *Kendall* v. *The United States*, *Kendall* v. *Stokes* and *Kentucky* v. *Dennison* are not authority with us under our statute. And under the authority of *Riggs* v. *Johnson County*, we must consider proceedings in mandamus as we find them under our Territorial laws. Is it an action at law under our statute? Mandamus, with us, is but a modification of the common-law proceedings before the statute of 9th Anne upon this subject. Much of it is only declaratory of the common law as it was before that statute. At common law the writ was issued to any inferior tribunal, corporation, board or person to compel the performance of any duty specially enjoined by law as a duty resulting from an office, trust or station, or to compel the admission of a person to the possession of an office from which he had been unlawfully excluded by such tribunal, corporation, board or person. This is section 518 of our Practice Act.

The writ issued at common law is the same as under our statute where there was not a plain, speedy and adequate remedy in the

ordinary course of law on the application of a party beneficially interested. At common law the application was supported by a suggestion under oath. The application, under our statute, is supported by affidavit. At common law the term "motion" is used instead of application, but an application is no more than a motion. In section 523 of our Practice Act it is called a motion. Section 521 of our Practice Act shows that the alternative writ may be granted without notice as at common law. The same section also shows· that the application may be heard on notice. This is nothing more than the rule *nisi* at common law to show cause. Under our Practice Act the proceedings are simplified, and the alternative writ is dispensed with when the application is granted on notice. Section 522 provides that there may be, at the proper time, an answer, under oath, made the same as to a complaint in a *civil action* to the affidavit, if notice be served, or to the alternative writ. This answer is nothing more than the cause shown under the rule *nisi*, or the return to the alternative writ at common law. Section 523 provides for a trial by jury when an issue of fact is raised by the answer. As before said, this trial by jury, under our statute, is discretionary with the court. It will be observed that the whole issue is not to be presented to the jury as in an ordinary action at law. If the court decides to submit the question of fact at issue to a jury, he must make an order in which shall be distinctly stated the question to be tried, and the place of trial. This is at variance with the common-law proceedings. Before the statute of 9th Anne there was no trial by jury of an issue of fact when such occurred upon cause shown. After that statute, as the proceedings after issue joined upon a question of fact were to be conducted as an action on the *case*, a jury was awarded. Taking this section 524, and sections 525 and 528 together, and it appears that the manner of presenting the issue to a jury in mandamus proceedings under our statute is more nearly allied to an issue framed in a chancery case and sent to a court of law to be tried than to those of law. During the time of this trial of the issue of fact, which may be tried in any county in the Territory, the proceedings are all the time pending in the court in which they were instituted, and the finding of any fact by the jury, in the court in which the question was ordered tried, must

be certified back to this court. And in a case where the answer is made, under notice, to the affidavit, no case is, in reality, pending all this time of the trial of this issue. The application is not entitled; the affidavit is not entitled, and the answer, under such circumstances, of course should not be entitled. And this we hold is the proper practice under our statute. Mandamus is governed by the rules of the common law when these have not been abrogated. High's Extra. Leg. Rem., § 8. These rules of practice have not been abrogated under our statute. At common law, in regard to entitling the proceedings, they were as set forth above. *Chance* v. *Temple*, 1 Iowa, 179; *Haight* v. *Turner*, 2 Johns. 371; *People* v. *Tioga*, 1 Wend. 291; *People* v. *Dikeman*, 7 How. Pr. 124; High's Extra. Leg. Rem. 509; Moses on Mandamus, 251; *State* v. *Johnson County*, 10 Iowa, 157.

The reason given for not entitling the application and affidavits, as will appear by the above authorities, is because no case is yet pending. The object of all the proceedings in mandamus before the writ issues is to enlighten the discretion of the court in determining whether or not to issue the writ. The granting of the writ of mandamus rests in the wise, legal discretion of the court. High's Ex. Leg. Rem. 9, 11 and 12, and cases cited; Moses on Mandamus, 18, and cases cited. And this last is true, whether or not issue be joined upon the affidavit or alternative writ. In this proceeding the application was not entitled, the affidavit was not entitled, the notice of the application was not entitled, and the answer should not have been if it is. To call this an action or suit at law would be certainly a misnomer; and it is not certainly a case at law unless that term signifies more than action or suit at law, and was used by congress in so broad a sense as to embrace proceedings for the writ of *certiorari*, the writ of *habeas corpus* and proceedings for *contempt*. Certainly congress could not have intended to use it in so extensive a sense. The statutes of our Territory, upon the subject of mandamus, show conclusively that our Territorial legislative power did not suppose it was providing for an action at law. Section 522 of our Practice Act provides, that the party "may show cause by answer under oath made in the same manner as an answer to a complaint in a *civil action*." Section 529 of said act provides: "The writ shall be served in the

same manner as a summons in *a civil action*, except when otherwise expressly directed by order of the court."

The manner in which the term *civil action* is used in these two sections shows conclusively that our legislative assembly did not consider that the proceedings in mandamus were a civil action. What is a civil action? The first section of our Practice Act is as follows: "There shall be in this Territory but one form of civil action for the enforcement or protection of private rights, and the redress or prevention of private wrongs." . It will be seen that the civil action here referred to has reference exclusively to private rights and private wrongs. And it may here be observed that it was the intention of our legislative assembly to provide for all of what are usually denominated actions at law and suits in equity. It is believed that all civil actions at law or suits in equity as used before our Code, had for their objects only the enforcement or protection of *private* rights and the redress or prevention of *private* wrongs. Of course a government might resort to one of these actions in a proper case, but when this was done it was treated as a person and the right it sought to enforce was in its nature a private right. It was one of that class of rights that in its nature may pertain as well to a private person as to a government. What is the nature of the proceedings called mandamus? "It is not applicable as a redress for mere private wrongs." Tapping's Mandamus, 59. "It is not, however, applicable as a private remedy." Id. 64. "It can be resorted to only in those cases where the matter in dispute, in theory, concerns the public, and in which the public has an interest. The degree of its importance to the public is not, however, scrupulously weighed." Moses on Mandamus, 18.

"In the specific relief which it affords, a mandamus operates much in the nature of a bill in chancery for a specific performance, the principal difference being that the latter remedy is resorted to for the redress of purely private wrongs or the enforcement of contract rights, while the former generally has for its object the performance of obligations arising out of official station, or specially imposed by law upon the respondent. The object of mandamus is to prevent disorder from a failure of justice and a defect of police, and it should be granted in all *cases where the*

*law has established no specific remedy, and where, in justice, there should be one.* And the value of the matter in issue, or the degree of its importance *to the public*, should not be too scrupulously weighed." High's Ex. Leg. Rem., § 1.

From the above authorities it appears that mandamus is not a remedy for the enforcement of private rights or the prevention or redress of private wrongs, but a remedy for the enforcement of public duties enjoined by law, and which, in theory at least, the public have a right to demand to be performed, and an interest in the same. The enforcement of the writ may incidentally, and as a result, affect private rights, but this is not the prime object of the issuance of the writ. We refer, in confirmation of this view, to the fact that the general practice is for the writ to issue in the name of the government or sovereign, on the relation of some party. In correct practice, as we have seen, the proceedings never are entitled, as for example, John Doe *v.* Richard Roe.

In all treatises upon pleadings pertaining to common-law actions there will not be found one word upon the subject of mandamus. It is not treated of by one of them as a civil action at law. Burrill, in his Law Dictionary, in defining the term "action," says : "It is further to be observed that there are many judicial proceedings conducted merely in the same form as actions before the same tribunals, and with the same general objects, viz., the enforcement of some legal right or remedy which, nevertheless, are not technically considered as actions, nor so denominated. Of this description are the proceedings at law by *writ of error, scire facias, mandamus, certiorari, habeas corpus*, and the like."

The attempt to classify the proceedings in mandamus is always futile. It is *sui generis.* Undoubtedly it may be called an extraordinary legal remedy, civil in its nature. Some courts have held that mandamus was a prosecution but not a criminal action, but a proceeding of a special and independent character. *Chance v. Temple*, 1 Iowa, 179.

The king's bench, in England, had, originally, exclusive jurisdiction over the writ of mandamus. Originally this court had no jurisdiction over any actions or remedies that did not savor of

a criminal nature. 3 Blackstone's Com. (marginal page) 42. It is evident Blackstone did not consider mandamus a common-law action. See Blackstone's Com., book 3, ch. 17. Upon considering these authorities we have a solution of what the legislative power of this Territory meant in sections 522 and 529 of our Practice Act, by the term "civil action." It referred to the action provided in the first section of our Civil Practice Act for the enforcement or protection of private rights and the redress or prevention of private wrongs. This, in most Codes of Civil Practice similar to ours, is called a civil action. Mandamus, being a remedy to enforce a public right and not for the enforcement or protection of private rights or the prevention or redress of private wrongs, is not a civil action. It is, undoubtedly, a civil remedy, but the terms "remedy" and "action" are not synonymous. The term "civil action," under our Practice, is, as we have seen, co-extensive with the common-law actions and suits in equity. Cases at law signifying nothing more than actions at law. Mandamus is not a case at law, then, under our Practice, and hence not within the clause of the law of congress under consideration, which guarantees a trial by jury in all cases cognizable at common law. We have been referred to but one authority which holds that the right of trial by jury is not absolute in cases in mandamus. *Atherton* v. *Sherwood*, 15 Minn. 221. No cases were cited holding a contrary view.

The case of *The People* v. *Pacheco*, 29 Cal. 210, was cited to show that there it was held to be nothing more than a civil action. It did decide that the clause of our Practice Act which provides that every action shall be prosecuted in the name of the real party in interest applied to *mandamus*, and that the proceeding instituted which exhibited a clear case for mandamus could not be prosecuted in the name of the State. As much as I am inclined to follow the rulings of that distinguished court upon the subject of practice, I totally disagree with its rulings in this particular in that case. That provision of our Practice refers to civil actions for the enforcement or protection of private rights and the redress or prevention of private wrongs, and hence does not apply to mandamus.

Our statute upon mandamus, which is the same as that of California, provides that the party beneficially interested may apply for this writ; and the authorities are almost universal that when the writ issues it is issued in the name of the government, and is entitled as a case by the government against the respondent, and is a command on the part of the government. Tapping's Mandamus, 59; Moses on Mandamus, 194; High's Ex. Leg. Rem., § 1; *Chance* v. *Temple*, 1 Iowa, 179.

Whether or not this writ shall be considered a prerogative writ makes very little difference in practice. It is a necessary and proper remedy over which certain courts are given cognizance by our laws; and the general authority given our legislative power to establish a full code of municipal laws, for this being called a Territorial government, includes the power to provide for this writ as a necessary and proper portion of our judicial system.

Much might be said in relation to the issues presented in this proceeding. There are a large number of issues tendered in the answers that go to the point that there was a fraudulent and illegal vote cast upon the subject of the approval of the capital law.

This is a question that the canvassers of the return of the ab stracts of the votes had nothing to do with. It was no part of their duty to determine what was the true and legal vote cast. What they were required to do was to determine what the abstracts of the vote returned to them showed upon this subject. As they have no right to go behind these abstracts they have no right to assign as a reason for not canvassing the true abstracts, that there was an illegal and fraudulent vote behind them.

If such an issue was allowed to be raised when the question was whether an election officer should canvass or not election returns, every single one of them, down to the judges of election, might raise the same issue, and there would be a clog upon our whole political system. Officers, whose duty by law is to canvass returns, have no other legal duties than these to perform, and as it would not be within the province of the proceedings in mandamus to compel them to go behind the returns and determine the actual legal vote cast, so they cannot set up what in law does not concern them, as officers, as a defense when they are required

to do what does concern them, as officers, under the provisions of law.

Again, many of the issues presented in the answers were set forth on information and belief. The answer to the affidavit or alternative writ provided for must conform to the same rules as would an answer to a complaint in a civil action. Civil Practice Act, § 522. In the case of *Sands* v. *Maclay*, *ante*, 35, this court held that, under the provisions of our statutes, an answer to a complaint upon information and belief would not be proper. The late amendments to the Civil Practice Act have not changed it so as to vary this ruling. It was doubtful whether a single issue was presented in this case in proper form, save the one that put in issue the fact as to whether there was any such town as Helena.

It is not necessary, however, to consider this question further, only to observe that the unsatisfactory manner in which an issue is presented should guide a court in exercising its discretion in such a proceeding as this, in awarding or refusing a jury. It is only when a material issue is raised by an answer that in this proceeding a court has the discretion to order an issue submitted to a jury. Civil Practice Act, §§ 521, 523 and 527.

It may be further observed that the character of the issue to be presented, and the condition of the public mind in the region where the court is held, and the peculiar interests at stake, and the inclemency of the weather that would prevent the court from procuring a jury from a distance in a less excited and interested region, and the delay that would be occasioned by sending the issue to another court to be tried, are all matters which a court may take into consideration in deciding upon a question of discretion.

When a court feels that the highest and best interests of a government will be protected and fostered by assuming all of the legal responsibilities of its judicial position, it is its duty to accept the situation no matter what considerations of personal prudence might dictate to the members of that body a different course. Considering all of the matters that should guide the legal discretion of this court in this proceeding, the majority of its members refuse the application for a jury.

As this opinion will be filed subsequent to the trial of the issues presented, I feel that it is my privilege to add to this opinion the following : The only material question that was presented to the court to determine was as to whether or not the abstract of the vote of Meagher county, which the marshal, secretary and governor had canvassed at their first session as a canvassing board upon this subject, was a forged one or not. Upon a consideration of the evidence before it, the court did not hesitate a minute in deciding that that abstract was a forgery. This was the unanimous opinion of the court. The only question upon which there was a unanimous opinion of the court upon any one material issue presented in all of these proceedings upon this subject; and I cannot refrain from observing that this, I think, fully vindicates the action of the court in its determination to refuse a jury.

KNOWLES, J. In the application of Chumasero and Johnston for a writ of mandate against the governor, secretary and marshal of this Territory, the question of the original jurisdiction of this court to entertain an application for a writ of mandate was considered, and it was there held by it that this court had such jurisdiction. I deem it necessary to add but a few words to that decision. On this point, section 9 of our Organic Act, after providing for the several courts of the Territory, uses this language : " The jurisdiction of the several courts herein provided for, both appellate and original, and that of probate courts and of justices of the peace, shall be as limited by law." This is a grant of power to the legislative authority over this subject of jurisdiction. The language used is not as definite and perspicuous as could be desired ; and, perhaps, no verbal criticism can be made upon it, considering the rest of the section, that would be free from objections. In this Territory, and, in fact, in all of the Territories having similar Organic Acts, the question of what was the true construction of this grant of power has created considerable anxiety and trouble, and instigated considerable investigation and thought.

The general construction the legislative departments of the several Territories have put upon this grant has been similar to that

decided upon by the supreme court of the United States in the case of *Hornbuckle* v. *Toombs*, 18 Wall. 648; and it is a maxim in the construction of statutes "that contemporaneous exposition is very strong."

No better impression can be conveyed of what the United States supreme court decided in that case, than will arise from an inspection of the exact language used by it. It is as follows:

"Whenever congress has proceeded to organize a government for any of the Territories, it has merely instituted a general system of courts therefor, and has committed to the Territorial assembly full power, subject to a few specified or implied conditions, of supplying all details of legislation necessary to put the system into operation, even to the *defining of the jurisdiction* of the several courts."

Again: "From a review of the entire past legislation of congress on the subject under consideration, our conclusion is, that the practice, pleadings, and forms and modes of proceeding of the Territorial courts, as well as *their respective jurisdictions*, subject, as before said, to a few express or implied conditions in the Organic Act itself, were intended to be left to the legislative action of the Territorial assemblies, and to the regulations which might be adopted by the courts themselves."

Whatever may be said about the point of the power of the legislative authority over the jurisdiction of the several Territorial courts, here decided, being *obiter dicta*, certain it is that the opinion does cover the point at issue, and holds, that subject to a few express or implied conditions, which will be considered hereafter, the legislative authority of the Territory may, under the grant before specified, fix and determine the jurisdiction of the several Territorial courts; and certain it is that the opinion was called forth in a case where the extent of the power conferred upon the legislative authority by this grant was under consideration. And it is further evident that the supreme court of the United States, in this case, intended to fully review this most vexed question in regard to the legislative powers of the Territories over the jurisdiction of Territorial courts, and to settle it permanently, and to place their decision upon a solid and enduring foundation. The Territories ought to be willing to be bound by that decision. It

VOL. II. — 35.

puts a liberal construction upon the grants of power to them, and gives them a standing that has frequently been denied them, even by that court, heretofore, and it is certainly good authority for Territorial courts to follow. Whether or not it is *obiter dicta* upon this point, it is the deliberate opinion of the highest judicial body in the United States, composed of able and experienced jurists. The next point I will consider is, what are the few express and implied conditions upon the legislative authority in exercising this grant of power? It is not difficult to determine what the express conditions are. They are contained in the proviso in section 9 of our Organic Act, and section 2 of the amendment thereto. A mere inspection will disclose them. But nowhere in the Organic Act is there an express provision that the supreme court shall not have any original jurisdiction. If there is any condition of that kind it must be an implied one. From the use of the terms "district courts" and "supreme courts," I do not see how any such condition can be implied. For if from these terms the jurisdiction is implied, then it is just as much implied that the district courts shall be courts of original jurisdiction as it is that the supreme court should have only appellate jurisdiction; and it is just as much implied that the district courts should be courts of exclusively original jurisdiction, as it is that the supreme court should have only appellate jurisdiction. Yet, under the interpretation which the several legislative departments of the Territories have given to this grant above referred to, appeals have been allowed from justices of the peace and the probate courts to the district courts, under laws they have enacted in pursuance thereto. It is true that now, under an amendment to our Organic Act, appeals from the probate to the district courts are provided for. But, long before this amendment, appeals from the probate to the district court were allowed under Territorial laws, and appeals to-day from justices of the peace to the district courts are authorized only by virtue of such laws. If the terms "district courts" and "supreme court" fix the jurisdiction of these courts, why was it necessary to insert the clause in our Organic Act, "The jurisdiction of the several courts herein provided for, both appellate and original, and that of probate courts and of justices of the peace, shall be as limited by law."

And why was it necessary to provide that the supreme and district courts shall possess chancery as well as common-law jurisdiction? And why was it thought best to enact that "writs of error, bills of exceptions, and appeals, shall be allowed in all cases from the final decisions of said district courts to the supreme court, under such regulations as may be prescribed by law." If the term "supreme court" fixes the status of that court as exclusively an appellate court, then, in the same section, we see the jurisdiction thereof fixed by the term used next, a grant of power to the legislative authority to define it. Thirdly, a limitation on this ground, namely, that it shall possess chancery and common-law jurisdiction. And lastly, we find it made an appellate court from the final decisions of all cases in the district court; a jurisdiction that, it is claimed, the very term gives it. The truth is, that to hold that the term "supreme court" fixes its jurisdiction, would make of section 9 an absurdity. The point that the Organic Act makes provision for writs of error, bills of exception, and appeals from the final decisions of the district courts to the supreme court, cannot raise the implication that the supreme court is only an appellate court; for if the conferring of one jurisdiction in the Organic Act preclues the conferring of any other, then the grant of jurisdiction that the "district courts shall have and exercise the same jurisdiction, in all cases arising under the constitution and laws of the United States, as is vested in the district and circuit courts of the United States," would preclude the district courts from exercising any other jurisdiction than this. If it is said that the jurisdiction here conferred on the district court is a particular one, then I answer, so is this appellate jurisdiction of the supreme court. It is confined to writs of error, and bills of exceptions and appeals from the FINAL DECISIONS of the DISTRICT COURT. Again, if this clause confers upon the supreme court all the jurisdiction it is entitled to, namely, appellate jurisdiction of the final decisions of the district courts, then, so far as this court is concerned, what force and effect is the grant that the jurisdiction of this court, as well as the others, shall be limited by law; and what was the use of granting it chancery and common-law jurisdiction? If it be said that the clause, "as limited by law," gave the legislative power the authority to pro-

vide the mode of taking writs of error, bills of exception and appeals to the supreme court from district courts.    What was the necessity of this other clause in relation to this very subject, "Under such regulations as may be prescribed by law."    If it be said that the legislative authority may make the supreme court an appellate court for the final decisions of the probate courts and of justices of the peace, I answer, certainly.    But from whence this power?    From the authority given in the general grant that the jurisdiction of the several courts shall be such as is limited by law.    This grant, by itself, certainly gives as much power over the original jurisdiction of this court as over its appellate jurisdiction.    There is no distinction in it.    What are the implied conditions referred to by the United States supreme court?    I am not fully prepared to say, but I can find, nowhere in the Organic Act itself, or out of it, any implication that the supreme court should not have any original jurisdiction.    I am inclined to think, however, that the supreme court might have referred to something like this:  In the 13th section of our Organic Act, there is this clause, "that the constitution and all the laws of the United States which are not locally inapplicable, shall have the same force and effect, within the said Montana Territory, as elsewhere within the United States."

This clause, by implication, would prevent our legislative authority conferring jurisdiction, in bankruptcy cases, upon the courts of the Territory, or of cases in admiralty, or cases affecting ambassadors, other public ministers, etc.    Many other cases might be enumerated.    I suppose, under the general restrictions upon the general government, which are restrictions upon Territories also, the legislative authority of a Territory could not abolish the right of trial by jury in the cases specified in the United States constitution.    Neither could it provide for holding a person to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury.    These are implied restrictions upon the legislative department of the Territory in prescribing the mode of judicial proceedings and practice.    Many other similar restrictions might be specified.

I only state these as giving my views in part as to what implied conditions I suppose the United States supreme court referred to.

In this, however, I may be mistaken.  That court has not stated what implied conditions it referred to.  Whatever they may be I can find none that the supreme court of the Territory cannot have any but appellate jurisdiction.  There is no language of the Organic Act that I can twist into conveying any such implication. As to the point that under the construction here given the legislative power might provide for appeals from the supreme court to justices of the peace, perhaps in cases involving not more than $100, or where the title to land did not come into controversy. But I have this to say here:  I have not much respect for an argument that is based upon the idea that it was the intention of congress to so tie up the legislative authority of the Territory as to preclude any possibility of it enacting foolish or ill-advised laws.  I suppose that congress, if those who advance such arguments do not so consider, thought that the legislative department of the Territories would possess average intelligence and would honestly desire to do what was for the best for the people it was called upon to act for, and would have a more intimate knowledge of their necessities than congress.  The creating of Territorial governments presupposed some ability on the part of the people of the Territories for self-government.

The legislative power of this Territory has undoubtedly conferred upon the supreme court original jurisdiction to issue the writ of mandate, and having found that it had the authority to do this, that terminates the inquiry upon this point.

In the matter of the application of Chumasero *et al.*, before specified, it was also determined that an elector of this Territory had such an interest in having the laws of this Territory properly complied with by its officers, that he might be properly denominated a party beneficially interested therein, and hence was a proper party to make the application for the writ of mandate to compel an officer to perform a legal duty due the whole people of the Territory.

The considerations that impelled this court in that application to this conclusion still appeal to me with overpowering force. Republican governments may be properly denominated civil associations, indissoluble except by universal consent, formed by the members thereof, for certain purposes, which they consider bene-

ficial to themselves. Among the objects of such a civil association are generally, " the establishment of justice, mutual protection, the promotion of the general welfare, the preservation of good order, and the protection of each individual ·member in his rights to life, liberty and property."

Our Territorial government, I take it, was created for the benefit of the people within its limits, and they are as much interested in preserving it as though it was their creature. The laws of a Territory are as much compacts between the citizens thereof as the constitution and laws of a republic are compacts between ·the members thereof. Office-holders, with us the same as in a republic, are but the agents of the people. Our laws are but compacts which the citizens have entered into through agents, namely, the legislative assembly. They are their acts. Each member of an association, whether the same be civil or private, is directly interested in having the agents of the same perform their legal duties, and which the agent, by assuming his official position, agreed to perform. Often, for the violation of official duties enjoined by law, the mode of procedure for redress is specifically pointed out by law, and this must be followed. The violation of a criminal statute is the breaking of a compact which the offender has entered into with every citizen, and each citizen is interested in seeing the criminal law or compact upon the subject of crimes enforced, but this can only be done in the mode provided by law. If the offense be a felony a grand jury must indict, and the public prosecutor, in the name of the government or people, prosecute.

If the offense be only a misdemeanor a citizen may institute an action in the name of government, or people, upon making the proper complaint. This is the rule in this Territory. In this proceeding the petition or affidavit of the applicant shows that a duty has been enjoined, by law, upon R. O. Hickman, as Territorial treasurer, which he has failed and refuses to perform. No mode, save by the writ of mandate, is provided, by our laws, to compel the performance of this duty. It is not made the duty, by law, of any person or officer to institute this proceeding for this purpose. If an elector cannot make such an application as this, then there is no redress. The law, at such a juncture, must remain unenforced, a dead letter, and our government, in this re-

spect, a failure, because there is no other provision of law author-
izing another agent to institute the proceeding to compel this
agent to do his legal duty. With such a holding there would be
a practical illustration of the old adage, "what is everybody's
business is nobody's business," and there would be an end of the
matter. Under such a ruling there would be no means, under
our law, of compelling a single officer in the Territory to perform
any legal duty which he owed to the public at large. I do not
deem it necessary that I should discuss the proposition, that an
officer would not possess the power to institute such proceedings,
unless specially empowered to do so by law. The authority of a
public officer is circumscribed by law. A district attorney cannot
act as a county commissioner, or a county commissioner as district
attorney. An application for a writ of mandate must be made
by a person beneficially interested in the performance of the of-
ficial duty required. Is the applicant, as an elector, beneficially
interested in having Hickman perform the duty specified? He is
as much interested as he would be in having any other officer per-
form any other legal duty due the people generally. As much
interested as he would be in having a public prosecutor prosecute
a criminal who had committed a revolting crime. If an elector
of this Territory, which was organized for his benefit, whose laws
are compacts to which he is a party, who may be called upon to
put his life at stake in the enforcement of the laws of the Terri-
tory, and the preservation of the Territorial government itself,
being subject to be called out as one of a posse comitatus, and to
military duty, and under the power of taxation, all of his prop-
erty subject to be exhausted for the same government, whose of-
ficers are his agents, and to which he has trusted his life, liberty,
and the tenure of his property, and the well-being of his family,
is not beneficially interested in seeing the laws of this Territory
enforced, and its officers perform their legal duties, it is difficult
to determine in what he is beneficially interested.

In what manner are the people at large beneficially interested
in a public officer performing his legal duties that would differ
from that of any one citizen? If a public officer was empowered
to institute these proceedings, how could he show, more satisfac-
torily to this court, that the people at large were beneficially in-

terested in an officer performing his legal duty than one citizen can? It may be remarked, also, that laws do not generally bear upon persons so much in their collective capacity as in their individual capacity. Most laws are made to protect the rights of individuals, and not the government. Hence the right to have laws enforced, and officers perform their legal duties, should pertain as much if not more to a private person than to the civil being called government. When a nuisance affects a great many people, yet affects them as individuals and not as members of a firm or association, each may maintain his action for the wrong done him. And when a legal duty is required of a public officer which is more for the benefit and for the convenience of citizens individually than for the government, it is difficult to see why a citizen is not a proper party to institute proceedings for the performance of this duty, although a great majority of the citizens of the Territory may be as much interested in having this duty performed as he. The very object of creating the writ of mandamus was more to protect public rights of individuals than private ones.

"The object of a mandamus is to prevent disorder from a failure of justice and a defect of police, and it should be granted in all cases where the law has established no specific remedy, and where, in justice, there should be one. And the value of the matter in issue, or the degree of its importance to the public, should not be too scrupulously weighed." High's Extra. Legal Rem. 4.

"It is founded on Magna Charta (chap. 29), and was introduced to ampliate justice by the prevention of disorders arising from either a failure or defect of police." Tapping on Mandamus, 58.

"As it was a remedy introduced to prevent disorder from a failure of justice, in pursuance of the principles of the common law, it ought now to be used upon all occasions where the law has established no specific remedy, and where in justice and in good government there ought to be one." Moses on Mandamus, 17.

To hold that a private citizen had not a beneficial interest sufficient to institute the proceeding of mandamus, where the matter complained of was one of public concern, would, in our Territory, as I have shown, prevent this important writ being used for one

of the chief objects for which it was created, namely, to prevent disorders arising from a defect of police, and would show that the legislative power of this Territory had provided a remedy for this purpose, and yet given no one the power to institute it. It is more reasonable to suppose that the legislative power of the Territory intended that the phrase beneficial interest should be so broad in its significance as to embrace the interest which every citizen has in having every public officer perform his legal duties. This I hold to be its proper construction.

In many States the courts have held that each citizen was so interested in having officers perform their legal duties, that he could institute the proceeding of mandamus to compel the performance of this duty. These authorities were cited in the opinion in the application of Chumasero and Johnson, above referred to. There are other authorities that apparently conflict with these. This court, in that case, however, thought that perhaps if the statutes of the States where these decisions were rendered were before us, it might be found that there was as distinct and positive a mode provided by law for proceeding in such class of cases as this as has been provided in our laws for proceedings in criminal cases, and that in such States, of course, this mode provided must be followed, and that it would appear, from these statutes, that a citizen was not a proper person to institute proceedings in mandamus where it was a matter that affected the people generally. If it should turn out, however, that the statutes of those States were similar to our own, then we stand in opposition to such rulings.

The fact that other allegations than the ones that the applicant was a citizen and elector of the Territory are made in the petition, which show only the propriety of the applicants applying for the writ, will not lessen the force of these important allegations. It is a well-known rule, in all pleadings, that if a party alleges more facts than are necessary these will not vitiate what is properly pleaded.

In the case above referred to, decided by this court, it was held, that, when the duty enjoined by law and required of an officer was due to the public generally, and not to a person, individually and exclusively, it was not necessary that any specific demand

should be made upon the officer to perform this duty, and hence no statement of demand was necessary in the affidavit of the applicant. There would seem to be some conflict of the authorities upon this point, but to me there are the best reasons for supporting the views held by this court in that case. The object of a demand upon an officer, generally, is to show him what his duties are in a given case. But in this case the law points out specifically the officer's duty, and he must take notice of the law, and he must know that it is his legal duty to perform it, and he must know further, that it is his legal duty to perform this act without any demand upon him. There can then be no reason in requiring a demand to be made of him before this proceeding would lie. It would apprise him of no new duty. The fifth objection is, that in the petition two distinct causes of action have been improperly united. If this is the case it was not pointed out to us in the argument for respondent, and upon an inspection of the petition or affidavit we fail to find such to be the case.

The sixth objection is, that the applicant has a proper remedy in damages for any injuries he may suffer for the failure of the respondent to perform the legal duty required of him. We hold this to be not true.

As well might it be said to a citizen, by a judge who refuses, without legal excuse, to pronounce judgment upon a person duly convicted of crime, if you are damaged by this act of mine bring your suit for damages. The truth is that the rules for assessing damages do not apply in such cases. No citizen can make out a case for damages when a public officer refuses to perform a legal duty due the public generally, yet who will not say that every law-abiding citizen is not interested in seeing this duty properly executed. We have held that he is beneficially interested in this. Yet should a jury be impaneled to assess any damages that might accrue for this failure of duty, it would be found that the damages were too remote and speculative for assessment. Upon this point see High's Extraordinary Legal Remedies, § 17; *Fremont* v. *Crippen*, 10 Cal. 211.

I come now to the most important objection to the application that pertains exclusively to this proceeding, namely, that the affidavit or petition does not state facts sufficient to warrant the

court in awarding the writ. The substance of the applicants' petition, outside of the points already noticed, is this :   R. O. Hickman is the Territorial treasurer; as such it is his legal duty to keep his office at the capital of the Territory ; that he keeps his office at Virginia City, which is not the capital thereof; that the town of Helena is its capital; that at the eighth session of the legislative assembly of Montana Territory an act duly passed said assembly removing the capital of this Territory from Virginia City to Helena, and at the first general election thereafter, to wit: the election held on the 3d day of August, 1874, said act was approved by a majority of the legal votes cast thereat upon this question ; that before said election due notice was given to the submission of said act to the legal voters of the Territory for their approval or rejection.

The point presented by the applicant is, that it is immaterial whether or not the governor approved of this act; that it is immaterial whether or not this vote was ever canvassed by the proper officers.   If the act passed the legislative assembly in proper form, and after due notice was approved by a majority of the legal votes cast at the general election on the 3d of August, 1874, in law the capital was removed from Virginia City to Helena.   Whether or not these points are well taken depends upon the construction of the 12th section of our Organic Act.   It is as follows:

" The legislative assembly of the Territory of Montana shall hold its first session at such time and place in said Territory as the governor thereof shall appoint and direct ; and at said first session or as soon thereafter as they shall  deem  expedient, the governor and legislative assembly shall  proceed to locate and  establish the seat of government for  said  Territory at such  place as they may deem eligible, provided that the seat of  government fixed  by the governor and legislative assembly shall not be at any time changed except by an act of the said assembly duly passed, and which shall be approved, after  due  notice, at the first  general election thereafter, by a majority of  the legal votes cast on that question."

The question we are called upon to consider in the construction of this section is: In what manner did congress intend to provide for a change of the  seat of  government of this Territory, after the same had been fixed by the governor and legislative assembly?

In arriving at the intention of congress it will be profitable to recur to the terms used in this section :

First, the governor is to fix the place for holding the legislative assembly ; next, the governor and legislative assembly shall establish the seat of government ; and lastly, this may be changed by an *act of the legislative assembly, duly passed and approved, after due notice, by a majority of the legal votes cast at the next general election.* There is certainly a distinction made here between the governor and legislative assembly.

A portion of section 4 of our Organic Act reads thus :

"*And be it further enacted,* That the legislative power and authority of the said Territory shall be vested in the governor and a legislative assembly. The legislative assembly shall consist of a council and house of representatives."

Here it will be seen that the governor is made a co-ordinate branch of the "legislative department." A portion of this "legislative power and authority" is vested in him. And here, again, we see a distinction between him and the legislative assembly. He is not a member of the legislative assembly.

Again, we find in section 6 this clause: ". Every bill which shall have passed the council and house of representatives of the said Territory shall, before it becomes a law, be presented to the governor of the Territory. If he approve, he shall sign it."

Taking all of these provisions of law together and there cannot be any doubt but that the governor cannot be called a member of the legislative assembly, or any portion of the legislative assembly. Can it be said, then, that an act of the legislative assembly, duly passed, is a bill passed by the council and house of representatives, and approved by the governor? What is the meaning of the term "act?" An act is a thing done or performed. "The result of public deliberation, or the decision of a prince, legislative body, council, court of justice, or magistrate." Webster.

"A thing done, or business formally transacted by a public body, and always expressed in writing, especially a legislative proceeding." Burrill's Law Dict.

"In the legal sense this word may be used to signify the result of a public deliberation, the decision of a prince, of a legislative

body, of a council, court of justice, or magistrate.  Also, a decree, edict, law, judgment, resolve, award, determination." Bouvier's Law Dict.

Generally it may be said that a proposed law is embodied in a bill.  When this bill is duly passed by a legislative body it becomes an act of that body ; that is a thing done.  As all acts or bills are generally required to be signed or approved by the executive department of a government, when the executive department signs or approves of a bill passed by the legislative department, or in other words, an act thereof, it becomes a law. Nowhere have I been able to find any use of the word " act " that would give it any other signification than the usual one, " a thing done."  When, therefore, we speak of a thing done by the legislative assembly, we cannot, certainly, mean a thing done by the legislative assembly and the governor, for we have seen that the governor is no part of the legislative assembly.  As the governor is invested with a portion of the legislative power and authority conferred upon this Territory, a law thereof is not only an act of the legislative assembly but of the governor also.  There has been some point made upon the words " duly passed."  This phrase qualifies the word " act," and the word " act " is limited by the clause " legislative assembly."  It is not an act, " a thing done," by the legislative assembly and governor that must be " duly passed," but of the " legislative assembly alone."  And this word " passed " is usually applied, in legislative proceedings, to the action of a legislative body upon a bill.  We say " a bill has passed the house or assembly," not that it has " passed the governor." The proper word for his action is " approved."  By recurring again to section 6 of our Organic Act, we will see the distinction here made, and that the term " passed " is used to denote the action of the assembly, and the term " approved " to the action of the governor.  And upon a further inspection of section 12 of our Organic Act, it would appear plain that the governor should not participate in an act changing the seat of government of the Territory.  The phraseology of the proviso ought to be sufficient : " *Provided*, that the seat of government fixed by the governor and legislative assembly shall not be, at any time, changed except *by an act of the said assembly duly passed*, and which shall be

approved, after due notice, at the first general election thereafter, by a majority of the legal votes cast on that question."

How could the governor and legislative assembly fix the seat of government? Only by a law or resolution which would, in effect, be a law. It would then be fixed, in the first place, by an act of the legislative assembly, which act would be approved by the governor. But in this proviso we see the act is to be one of the legislative assembly which shall be APPROVED by a majority of the legal votes cast on the question. The same language used in relation to the action of the people that is used by the governor when he assents to an act of the legislative assembly. We might place these two assertions by the side of each other: An act of the legislative assembly, approved by the governor, becomes a law. An act of the legislative assembly, approved by a majority of the legal votes cast, becomes a law.

The former is true of every act of the legislative assembly, except upon this question of the removal of the capital. The latter is true on the question of the removal of the seat of government only. The construction I put upon this section is, then, that the seat of government may be changed by an act of the legislative assembly alone, duly passed, which is approved by a majority of the legal votes cast, at the proper time, upon that question, after due notice. If these events have transpired, there is a law changing the seat of government of the Territory. The resistant must take notice of this law. The issue presented in this case upon this subject of a change of the seat of government of the Territory is, then, what was the legal vote cast on this question at the last general election? The certificate of the proper canvassing board, or commission of the Territory, is only *prima facie* evidence of this fact. The certificates of the canvassing boards of the several counties can have no greater force. It is the approval of the people of the act of the legislative assembly upon this subject that makes it a law, not the canvass of the votes cast thereon by a commission or boards. Hence, under the issue here offered, the legal vote upon this subject may be determined.

WADE, C. J. I concur fully in the decision that the objections of the respondent to the petition of the relator be overruled,

and in all matters contained in the opinion, except the portion thereof relating to the question, whether or not, in the passage of an act providing for the removal of the seat of government of the Territory by the legislative assembly, it is necessary, to the validity of such act, that it be approved by the governor. The objections of the respondent do not raise this point, and there is nothing in the petition to bring the question before the court.

The averment of the petition is, that this act providing for the removal of the seat of government was duly passed by the legislative assembly. There is no averment, and no intimation of any kind anywhere, that this act was not approved by the governor, but the presumption is that it was so approved by the use of the averment that it duly passed the assembly. The respondent can deny this and raise an issue thereon, or the petition could have raised the question by proper averments, and until such issue be made by an answer, or the question is presented in the petition itself upon demurrer or motion by the respondent, its discussion, it seems to me, is a mere speculation, and is not, by any rule or reason, legitimately before the court.

No objection, then, being made to the passage of the act, or to its validity as a law, the great question is, whether or not the legal voters at the election approved thereof. And this question upon an answer raising a proper issue can be tried in this proceeding. The abstract of the canvassers is *prima facie* evidence of the vote, but the court can go behind this, and ascertain what the exact vote in fact was.

Virginia City cannot retain, nor Helena acquire the capital by virtue of a canvass, but its location must depend upon the legal vote of the people under the act of the legislature providing for its removal.

SERVIS, J., dissenting. While I dissent from the opinion of the court as announced by the chief justice, I consider it due to counsel, as well as myself, to attempt to assign some reason therefor; and while I do not dissent from some propositions necessary to be considered in forming the opinion of the court as announced, yet I do dissent from that relating to the authority of this court to exercise original jurisdiction in mandamus, and

the sufficiency of the complaint to entitle the petitioners in any court to the relief they demand, and also to the denial to the respondents of a trial by jury. I discuss these in their order:

First. As to the original jurisdiction of this court.

Questions of judicial jurisdiction are questions of special importance; and while courts are clothed with unrestricted rigor in the exercise of their judicial powers, yet jurisdiction cannot be invoked except upon subjects, and by those for whom written authority exists, either in the constitution, acts of congress or other legislation thereunder. And courts, always keeping in view this principle, have always hitherto, with great uniformity, disclaimed jurisdiction not thus expressly given, and always taken notice of an objection to their jurisdiction whenever it occurred and however presented, even against the consent of parties.

The only jurisdiction possessed by the several courts of this Territory is derived from the acts of congress, either directly conferred, or by authority delegated to the legislative assembly of the Territory to confer the same. So that in order to ascertain the jurisdiction of our courts we must first look to the acts of congress relative thereto, all of which is contained in the ninth section of the act organizing this Territory. By virtue of this act, the Territory is vested with four distinct courts, viz.: a supreme court, district courts, probate court and justices of the peace. Upon the supreme and district courts the act directly conferred *appellate* and *original* jurisdiction, and also chancery and common-law jurisdiction. Upon the probate and justices' courts it conferred *no* jurisdiction, but confided the same solely to the legislative assembly of the Territory. It provides : " The jurisdiction of the several courts herein provided for, both appellate and original, and that of probate courts and of justices of the peace, shall be as limited by law, *provided* that justices of the peace shall not have jurisdiction of any matter in controversy when the title of land may be in dispute, or where the debt or sum claimed shall exceed $100; and the said supreme and district courts, respectively, shall possess chancery as well as common-law jurisdiction."

From this provision of the Organic Act it is claimed that this court can exercise original jurisdiction in mandamus, simply be-

cause of the words "The jurisdiction of the several courts herein provided for, both *appellate* and *original*, * * * shall be as limited by law." Such would be a forced construction in favor of jurisdiction, a construction unwarranted and unknown to the law. When the congress of the United States created the courts of this Territory it classified the jurisdiction between the supreme and district courts, and in so doing confined and conferred upon one appellate and upon the other original jurisdiction, and thereby prohibited the legislative assembly of the Territory from in any manner transferring or altering the same, but it left to it the power to regulate the extent, and the mode and manner in which the courts should exercise the same; that is, the manner in which the supreme court should exercise appellate jurisdiction, and the district courts original jurisdiction.

The words, "the several courts," clearly refer to the supreme court, with its jurisdiction *appellate*, and to the district court with jurisdiction *original*.

What was evidently intended by the Organic Act, which provides that "The jurisdiction of the several courts herein provided for (meaning the supreme and district courts), *and* that of probate courts and of justices of the peace, shall be as limited by law," was, that the legislative assembly might limit by law the jurisdiction *appellate* of the supreme court, and the jurisdiction *original* of the district courts, with *sole* power over the other courts except as to the amount in controversy and the title to lands.

This construction of the Organic Act is in perfect harmony with the distinction ever intended to be observed between similar superior and inferior courts, and thus relieves the judicial system from that complex and unprecedented condition into which it would fall if *both* courts exercised jurisdiction alike, and without the right of appeal. Such has hitherto been the limit recognized by our legislature, as well as all others possessing a similar Organic Act.

But the chief justice, in his elaborate and exhaustive opinion, insists, that if such be the correct construction of the Organic Act then all appeals from the inferior courts to the district courts are without authority and void. Such assertion and such conclusions are without foundation in law. The very chief functions of a

VOL. II.—37.

supreme court are the exercise of appellate and supervisory jurisdiction over inferior tribunals. And the uncontroverted doctrine relative to the scheme of judicial tribunals is, that one of the great missions of courts of record, having original jurisdiction, is to receive appellate jurisdiction under legitimate legislation, and to all such courts appellate jurisdiction is necessarily implied. But it was never the province of supreme appellate courts to receive original jurisdiction, unless expressly conferred upon them by law. But if this long and well-established doctrine is to be overcome by mere assertion, without authority or logical reasoning, I can no better maintain my proposition than by referring to the second section of our amended Organic Act, where express provision is made for appeals from the inferior courts to the district courts. Our legislature recognized this fundamental law and engrafted the same into our practice, and then made express provision for all such appeals to the district court. Cod. Sts. 161, § 621.

Again, the chief justice seeks to support his view of original jurisdiction under the grant extending to "the several courts" chancery and common-law jurisdiction. The conferring of this jurisdiction certainly did not create any new powers or originate any new modes of administering justice. If this doctrine of indiscriminate jurisdiction be correct, then in all cases wherein the district court has original jurisdiction the supreme court has the same, and when exercising it, as in the case at bar, we would have no appellate court. Such would not only be manifest injustice to the suitor, but would defeat the expressed will of congress.

This effort to take jurisdiction, *both* at common law *and* under the statute, is in direct opposition to the holding of the supreme court of the United States in the case of *Williamson* v. *Berry*, 8 How. (U. S.) 495, where the court holds that a court of chancery or equity powers, exercising jurisdiction in particular cases by virtue of a special statute, cannot deviate from the letter of the act, nor make a decree founded part upon the statute and part upon its general jurisdiction (as in the case at bar). See, also, *Bollman* v. *Swartwout,* 4 Cranch, 93; *Sheldon* v. *Sill,* 8 How. (U. S.) 441.

The authorities cited in the opinion of the court in favor of jurisdiction are few, meagre, and to me quite unsatisfactory. But one single authority is cited from territorial courts, that from Colorado, where one of the three judges was a party to the suit, and the other two, disagreeing, whereby the writ was denied. And in that case the question of jurisdiction over the *subject* of the action was *not* raised; it was the jurisdiction of the court over the *person* of the defendant only that was raised. *People* v. *Hallett*, 1 Col. 362.

The case of *Kendall* v. *United States*, 12 Peters, is cited in the opinion of the court in support of the jurisdiction. This is a case containing 48 pages, and it is not strange that, in the short time the court has had in which to examine the many authorities presented on the various questions involved, it should be led into error, as it evidently has been. This case is not analogous to the one at bar. Instead of supporting the proposition, maintained by a majority of the court, it more nearly maintains the doctrine that no court can exercise original jurisdiction in mandamus unless expressly conferred upon it, as in that case it was conferred upon the circuit court of the District of Columbia. Let any disinterested, unbiased lawyer carefully examine that opinion, and he will readily see its inapplicability to the case at bar.

The case of *Hornbuckle* v. *Toombs*, 18 Wall., is also cited in support of the position of the court. This decision, when construed in the light of the facts, comes far short of being an authority therefor. The most that is there held in support of the authority of the legislative assembly to confer this jurisdiction is, that such power *may* be conferred, subject, however, to *specified* or *implied* conditions. This, instead of being authority in favor of the jurisdiction, is, by analogy and parity of reasoning, in opposition to it; for I maintain that our Organic Act not only *implies* that this jurisdiction shall not be conferred but by a fair and reasonable construction; it *specifies* that it shall not be except in an appellate form.

I am well aware that excerpts may be selected from different decisions, especially in *obiter dicta*, which would seem to present an apparent difference in the holdings of courts upon this question; but when the facts, in each case, are carefully consid-

ered, and those excerpts and *obiter dicta* construed in the light of the facts in each case, it will be found that there is no substantial difference in the rulings of the courts upon this question. But even were I to concede that the Territorial legislature had power given it, whereby to confer jurisdiction upon this court, I insist that it never did confer it.

The only pretended authority is from section 518 of our Practice Act, which provides, "it (the writ of mandate) may be *issued* by any court in this Territory except a justice's, probate or mayor's court." No one doubts but that the supreme court in the exercise of *appellate* jurisdiction could *issue* such a writ. But that it was not given original jurisdiction to hear, determine or issue the writ, is, to me, from an examination of the statute seeking to regulate the practice in mandamus, too apparent to admit of argument. Let any lawyer carefully examine section 523 of that act, where it is provided that the court may (and as I think in justice, it always ought) grant a trial by jury, and then let him imagine what speedy justice would be guaranteed in a court that need not convene only once a year. Let him also examine section 525 of that act which relates to motions for a new trial, which are to be brought on before the *judge* — not the three judges. Let him examine every section of that act, and I submit, the inevitable result of his investigation will be that our entire statute upon mandamus is wholly inapplicable to any other than the district courts. But I will not longer pursue this branch of the case, and will refer to the following authorities, viz.: Article 3, Constitution United States ; *Marbury* v. *Madison*, 1 Cranch, 174 ; 3 Abb. N. Digest, 245, § 5 ; *People* v. *Kern. Co.*, 47 Cal. 205 ; *Tyler* v. *Houghton*, 25 id. 28 ; Smith's Com. Const. Law, §§ 445, 490, 491 ; *Kendall* v. *United States*, 12 Pet. 524 ; Cod. Sts. 160, § 617. And wherein district courts have original jurisdiction, " as limited by law," see Cod. Sts. 161, §§ 620, 621, 622, 624.

Second. As to the sufficiency of the complaint.

This is an action against the governor, the secretary and marshal of the Territory, to compel them to procure an abstract of the votes of Meagher county, and to canvass the same with those of the other counties, and to proclaim the result, upon the alleged ground that the abstract of Meagher county, as canvassed, was incorrect, false and forged.

Before the writ of mandamus will ever issue there must be a default — and there must also be a demand — a request to perform the required duty. There is neither fraud, default or demand averred against the defendants by the plaintiffs. The fifth and sixth sections of the laws of the eighth session, p. 45, together with the twenty-ninth and thirtieth sections of the codified laws, p. 466, define the respective duties of the defendants upon this subject. It nowhere makes it the duty of the governor or marshal to·send for or procure defaulting abstracts. The secretary alone is required to do this, and the legal presumption is that he would do so when requested; if not, then, and then only, would this action lie against him. But to assume that the marshal and governor would, when such abstracts were procured, refuse to perform the duty, then, and not until then, enjoined upon them by law, would be an unwarrantable assumption by any court. The duty required is not a *joint* one, until after all the abstracts are procured. Had *no* abstracts been procured, could the governor and marshal, or either, have been required to procure them? Clearly not. Then how are they proper parties to this suit, to be subjected to costs and the vexation of defending the same?

As to the necessity of averring and proving a demand and refusal, some authorities have been cited, such as High on Ex. Leg. Rem., and *State* v. *Bailey,* 7 Iowa, 397, which, at first sight, would seem to be innovations upon the long and well-established rule which requires a demand to precede the action. But upon a careful and critical examination of these few authorities it will be found that the rule, as there laid down, only seeks to vary the rule in cases of seeming absolute necessity, arising, as these authors say, " where no individual interest is affected, and where no one is empowered to make demand," which is not the case at bar. Here the plaintiffs aver an individual interest, and make that the very basis of their right to maintain the action. If so, they have the authority to make the demand, as was always required by law, in all ages, under like circumstances, as is so authoritatively recognized and sanctioned by the following authorities: Moses on Mandamus, 18, 202, 204; Tapping, 282; *United States* v. *Boutwell,* 17 Wall. 607; *People* v. *Romcro,* 18 Cal. 91; *Crandall* v. *Amador Co.,* 20 id. 75; A. &

A. on Corp., § 707; *Rex* v. *Wilts C. Co.*, 3 A. & E. 481, and the numerous authorities there cited.

Third. The remaining point, from which I dissent, is that of denying the right of trial by jury, which, being announced orally, I cannot now recall the exact language used by the court as reasoning therefor, except the discretionary power as contained in the 523d section of our Practice Act. Courts, when attempting to exercise judicial discretion, would be more likely to administer justice according to law by observing the doctrine of Chief Justice MARSHALL, who says: "When courts are said to exercise a discretion, it is a mere legal discretion; a discretion to be exercised in discovering the course prescribed by law, and is never exercised for the purpose of giving effect to the will of the judge."

If, then, this is an action under our Code of Practice, and an issue of fact joined, which is not denied, then section 190, p. 64, is in direct conflict with section 523, p. 142, from which my brethren derive their discretion power, whereby they denied the right of trial by jury; for, by section 190, it is provided that all issues of fact *shall* be tried by a jury, unless it be waived.

But the supreme court of the United States has, very lately, set at rest any doubt as to the *character* of this action. In *Heine* v. *Levee Commissioners*, 19 Wall. 660, Justice MILLER, in delivering the opinion of the court, says: "Mandamus is essentially and exclusively a common-law remedy, and is unknown to the equity practice."

Although it has, at all times, been the uniform practice of courts to try all such issues of fact by jury, yet congress, perhaps fearing that Territorial courts might do as has just been done, did, in April, 1874, pass an act entitled "An act concerning the practice in Territorial courts," wherein it is provided: "That no party has been or shall be deprived of the right of trial by jury in cases cognizable at common law." 18 U. S. St. 27.

Here, then, the supreme court of the United States has declared mandamus to be exclusively a common-law remedy, and the congress of the United States has guaranteed to it the right of trial by jury. But the supreme court of Montana ignores it all and denies this right.

With all due deference to and respect for the opinion of my brethren, and with an equal desire that right and justice shall be maintained, yet, to judicially obtain the same in utter disregard of the plain provisions of the law, as I understand it, I can never give my assent.